UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

HASSAN A. ASSI,

      Plaintiff,

            v.

JEREMY HANSHAW, et al.,

      Defendants.

Case No. 1:20-cv-839
JUDGE DOUGLAS R. COLE

## OPINION AND ORDER

In this action, the Plaintiff, Hassan A. Assi, sues the Lawrence County Board of Commissioners (the "Board"), the Lawrence County Sherriff (Jeffrey Lawless) and a slew of officers in the Sheriff's Department (collectively the "Defendants"). Assi asserts that the Defendants violated his statutory and constitutional rights during a roughly three-week stay in the Lawrence County Jail. In particular, Assi claims that the Defendants discriminated against him in various ways because he is hearing impaired. Based on that, he advances claims under (1) Title II of the Americans with Disabilities Act; (2) § 1983, based on alleged First Amendment violations; (3) the Ohio Constitution's free-speech provision; (4) § 1983, based on allegations of excessive force; and (5) § 1983, based on alleged failure to supervise.

The cause is currently before the Court on Defendants' Motion to Dismiss ("Motion," Doc. 20), in which Defendants seek dismissal of all five counts in the Complaint. For the reasons stated more fully below, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' Motion (Doc. 20) and **DISMISSES** all claims in Assi's Complaint (Doc. 1), with the exception of the following: (a) Count II's § 1983

First Amendment retaliation claims against Jeremy Hanshaw, Joshua Golsby, and Jonathon Spoljaric in their individual capacities; and (b) Count IV's § 1983 excessive force claim against Jonathon Spoljaric in his individual capacity.

## BACKGROUND

In deciding a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the Court accepts as true the factual allegations in the Complaint. Thus, the Court reports, and relies on, those allegations here, but with the disclaimer that these facts are not yet established, and may never be.

Assi is a hearing-impaired individual. (Compl., Doc. 1, #8[1]). On July 26, 2019, Assi was arrested and taken to the Lawrence County Jail ("LCJ") in Ironton, Ohio. (*Id.*).

After arriving at the LCJ, Assi "requested to use a Text Telephone ('TTY phone')."[2] (*Id.*). According to Assi's Complaint, however, jail officials denied that request. (*Id.*). Assi states that, "[u]pon information and belief, this is because the [LCJ] does not have a TTY phone or similar device." (*Id.*).

On August 5, 2019,[3] Defendant Corporal Scott Williams, an LCJ employee, gave Assi "a partial tray of food." (*Id.*). Assi filed a grievance that same day. (*Id.*).

---

[1] Refers to PAGEID #.

[2] "A 'TTY' phone is a device that allows persons who are hearing impaired or speech impaired to communicate by telephone by allowing them to send and receive text messages." *Shannon v. Alameida,* No. EDCV 03-375, 2010 U.S. LEXIS 128558, at *17 n.5 (C.D. Cal. Oct. 26, 2010).

[3] Most of the dates in Assi's Complaint are described as approximate (i.e., "on or about August 5, 2019"). For the sake of brevity, the Court omits these qualifiers in describing the facts of the case.

Additionally, as a result of his disability, Assi struggled to hear the jail's "chow calls." (*Id.* at #9). Consequently, he asked that he be woken up for breakfast by one of the jail's employees. (*Id.*). After this request was denied, Assi requested that jail officials move him to a different area or a separate facility "so that he would not miss any further 'chow calls.'" (*Id.*). After making that request, Assi was moved to the LCJ's "drunk tank"[4] on August 7, where he would remain for nine days, until his release on August 16. (*Id.*). During this period, Assi "was denied recreation and was only permitted two showers." (*Id.*).

Assi also alleges that, while he was in the "drunk tank," he was "harassed and threatened" by several of the Defendants in this case. (*Id.*). Specifically, Assi first alleges that, each time Defendant Deputy Shanna Dillon was working during this period, Assi asked to use the phone. (*Id.*). Assi would also request that Defendant Dillon assist him in using the phone, since—as previously explained—the Jail did not have special equipment to accommodate Assi's disability. (*Id.*). Each time Assi made these requests, however, Dillon would deny them. (*Id.*).

Second, Assi alleges that, while in the "drunk tank," he did not receive his morning food tray or received only partial trays of food. (*Id.*). Assi also alleges that Williams, who was "often the [officer] who oversaw that inmates were properly fed," would "not communicate with [Assi] to allow him to receive his food." (*Id.*).

---

[4] The Complaint refers to the area in which he was held by the term "drunk tank." Based on its use in the Complaint, Defendants adopt that same terminology in their Motion to Dismiss. Accordingly, for consistency, the Court will use that label, as well.

3

Third, Assi states that, on August 9, he "began to loudly read from his Bible as a form of protest for being confined to the 'drunk tank.'" (*Id.* at #10). "For his actions," Assi alleges, he "was removed from the 'drunk tank'" by Defendants Deputy Jeremy Hanshaw and Deputy Joshua Golsby "and placed into a restraint chair as punishment." (*Id.*).

Fourth, Assi alleges that—at some point while in the "drunk tank"—Hanshaw "called [him] 'retarded' because of his disability." (*Id.*).

Fifth, on August 12, Assi "asked to speak with a shift supervisor" to request § 1983 grievance and disability rights forms. (*Id.*). Defendant Deputy Brad Spoljaric allegedly warned Assi that "filing grievances would make his life worse." (*Id.*). Subsequently, Defendant Deputy Jonathon Spoljaric entered the "drunk tank" in the middle of the night while Assi was sleeping and demanded his blanket and sheet. (*Id.*). When Assi asked J. Spoljaric why he was taking his bedding, J. Spoljaric "removed [Assi] from the 'drunk tank' and confined him to a restraint chair for several hours." (*Id.*). While he was in the chair, Assi asked Defendant Dillon for help. (*Id.* at #11). Dillon told Assi not to "talk back" and "laughed at him while doing so." (*Id.*).

Sixth, on August 13, Defendants Corporal Robert Bowles and Deputy Matthew Chinn "removed [Assi] from the 'drunk tank' and attempted to throw him into a shower while he was fully clothed and restrained with handcuffs behind his back." (*Id.*). Assi, though, "feared for his safety and declined to go into the shower fully clothed." (*Id.*).

4

Seventh, on August 14, Hanshaw "without provocation or reason to do so, entered the 'drunk tank' with his Taser drawn and strobe light flashing." (*Id.*). Because of his disability, however, Assi "could not understand any commands being given by … Hanshaw and feared for his safety." (*Id.*). Hanshaw and Cochran then "placed [Assi] into the restraint chair without reason or authority to do so." (*Id.*). Cochran also told Assi "to stop requesting phone calls and to 'just read [his] little book,' referencing the Bible." (*Id.*).

After each of the incidents described above, Assi alleges that he "would attempt to document the[] events by writing a note" on a sheet of paper. (*Id.*). Assi would then show that note to a camera inside the "drunk tank." (*Id.*). However, Assi alleges that "the brightness levels on the camera in the 'drunk tank' were adjusted so that [his] notes could not be read." (*Id.*).

Assi also allegedly filed grievances about his treatment with Defendant Major John Chapman, the LCJ's administrator, and requested to be transferred to another facility. (*Id.* at #11–12). Chapman denied that request. (*Id.* at #12).

On October 23, 2020, Assi filed the instant Complaint, bringing claims against the all the officers described above, as well as Lawrence County Sheriff Jeffery Lawless and the Lawrence County Board of Commissioners. (Doc. 1). Assi's Complaint alleges five separate counts, as follows:

- Count I: violation of Title II of the Americans with Disabilities Act ("ADA") against Chapman, Hitchcock, Lawless, and the Lawrence County Board of Commissioners;
- Count II: restraint of freedom of speech in violation of the First and Fourteenth Amendments against Hanshaw, Golsby, J. Spoljaric, and Dillon;

- Count III: restraint of freedom of speech in violation of Article I, Section 11 of the Ohio Constitution against Hanshaw, Golsby, J. Spoljaric, and Dillon;
- Count IV: excessive force in violation of the Fourteenth Amendment's due process clause against Hanshaw, Golsby, J. Spoljaric, B. Spoljaric, Williams, Dillon, Cochran, Bowles, Chinn, and Chapman;
- Count V: failure to hire, train, and supervise, and for customs, policies, and practices causing violations of the Fourteenth Amendment against Chapman, Hitchcock, and Lawless.

(*Id.* at #12–18). With the exception of the Lawrence County Board of Commissioners, Assi brings his claims against all Defendants in both their official and individual capacities. (*Id.* at #1–2).

Subsequently, on February 10, 2021, the Defendants collectively filed a Motion to Dismiss, where they argue that each of the above counts fails to state a claim upon which relief can be granted. (Doc. 20, #129).

## LEGAL STANDARD

At the pleadings stage, a complaint must "state[] a claim for relief that is plausible, when measured against the elements" of a claim. *Darby v. Childvine, Inc.*, 964 F.3d 440, 444 (6th Cir. 2020) (citing *Binno v. Am. Bar Ass'n*, 826 F.3d 338, 345–46 (6th Cir. 2016)). "To survive a motion to dismiss, in other words, [Assi] must make sufficient factual allegations that, taken as true, raise the likelihood of a legal claim that is more than possible, but indeed plausible." *Id.* (citations omitted).

In making that determination, the Court must "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008) (internal quotation marks omitted). That is

so, however, only as to well-pled factual allegations. The Court need not accept "'naked assertions' devoid of 'further factual enhancement.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (brackets omitted) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 557 (2007)). Likewise, the Court need not accept as true any legal conclusions alleged in a complaint; "labels and conclusions" or a "formulaic recitation of the elements of a cause of action" will not suffice. *Id.*

With that in mind, the well-pled facts must be sufficient to "raise a right to relief above the speculative level," *Twombly*, 550 U.S. at 555, such that the asserted claim is "plausible on its face." *Iqbal*, 556 U.S. at 678. Under the *Iqbal/Twombly* plausibility standard, courts play an important gatekeeper role, ensuring that claims meet a threshold level of factual plausibility before defendants are subjected to the potential rigors (and costs) of the discovery process. Discovery, after all, is not meant to allow parties to discover whether a claim in fact exists, but rather to provide a process for gathering evidence to substantiate an already plausibly-stated claim. *Green v. Mason*, 504 F. Supp. 3d 813, 827 (S.D. Ohio 2020).

## LAW AND ANALYSIS

In this case, Assi brings a wide variety of claims against various Defendants allegedly involved in his detention at the LCJ. These claims can be divided into three groups: first, claims arising under the ADA (Count I); second, claims arising under the Ohio Constitution (Count III); and third, claims arising under the U.S. Constitution (Counts II, IV, and V). The Court addresses each of these categories below.

A.    **Count I: ADA Claims**

First, Assi brings several claims under the ADA. Specifically, Assi contends that Chapman, Hitchcock, Lawless, and the County Board of Commissioners (collectively the "ADA Defendants") violated the Title II of the ADA when they: (1) failed "to furnish appropriate auxiliary aids and services to [Assi] so that he could effectively communicate during his incarceration;" (2) "fail[ed] to transfer [Assi] to a facility that could accommodate his disability;" and (3) "place[d] [Assi] in the 'drunk tank.'" (Compl., Doc. 1, #12–13).

"Title II of the ADA provides that no qualified individual with a disability shall, because of that disability, 'be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.'" *Palladeno v. Mohr*, No. 20-3587, 2021 WL 4145579, at *3 (6th Cir. Sept. 13, 2021) (quoting 42 U.S.C. § 12132). "Public entit[ies]," as the term is used here, includes county jails, like the LCJ. *Brooks v. Cnty. of Macomb*, No. 13-15082, 2015 U.S. Dist. LEXIS 94161, at *24 (E.D. Mich. May 28, 2015).

The Sixth Circuit "recognize[s] two types of claims under Title II of the ADA: (1) failure-to-accommodate claims and (2) intentional-discrimination claims." *Keller v. Chippewa Cnty.*, 860 F. App'x 381, 385 (6th Cir. 2021). With a failure-to-accommodate claim, a defendant is liable if he or she "could have reasonably accommodated the plaintiff's disability, but refused to do so." *Id.* (quoting *McPherson v. Mich. High Sch. Athletic Ass'n*, 119 F.3d 453, 460 (6th Cir. 1997)) (modifications omitted). On the other hand, "an intentional-discrimination claim asserts that the plaintiff's 'disabilities were actually considered by the defendant in formulating or

8

implementing' the harmful policies or conduct." *Id.* (quoting *McPherson*, 119 F.3d at 460) (modifications omitted).

Here, although Assi's Complaint is less than clear, he appears to be asserting both types of Title II claims. For example, his assertion that the ADA Defendants failed to provide appropriate auxiliary aids and failed to transfer him to a different facility that could accommodate his disability are best construed as failure-to-accommodate claims. Conversely, Assi's allegation that the ADA Defendants placed him in the "drunk tank" based on his disability is closer to an intentional discrimination claim. The Court addresses each of these categories of claims below.

### 1.    Failure-to-Accommodate Claims

The Court begins with Assi's failure-to-accommodate claims. Assi argues that the ADA Defendants failed to accommodate his disability because they did not provide auxiliary aids and services so he could communicate while he was detained in the LCJ. As the Complaint explains, "[u]pon being booked into the [LCJ] and during his entire pretrial detention, [Assi] requested to use a [TTY phone] so that he could communicate with those outside the jail in the same manner afforded other incarcerated persons." (Compl., Doc. 1, #8). Because the LCJ did not have a TTY phone, however, this request was not granted. (*Id.*). Relatedly, Assi also alleges that the ADA Defendants are liable under a failure-to-accommodate theory because they failed to transfer him to a different facility once it became evident that they could not provide for Assi's needs. (*Id.* at #13).

9

In describing failure-to-accommodate claims, the Sixth Circuit has observed that "Title II of the ADA 'does not expressly define "discrimination" to include a refusal to make a reasonable accommodation for a person with a disability.'" *Keller*, 860 F. App'x at 385 (quoting *Madej v. Maiden*, 951 F.3d 364, 372 (6th Cir. 2020)). Instead, the reasonable-accommodation requirement is set forth in Title II's implementing regulations. *Id.* (citing 28 C.F.R. § 35.130(b)(7)(i)). To recover on a failure-to-accommodate claim under Title II, a plaintiff must show the following:

> (1) he is disabled; (2) he was "qualified" to take part in the "services, programs, or activities" of the public entity; (3) he was "excluded from participation in" or "denied the benefits of" such "services, programs, or activities"; and (4) this exclusion or denial occurred "by reason of" his disability.

*Id.* at 385–86 (quoting 42 U.S.C. § 12132).

Here it is undisputed that Assi—as a hearing-impaired individual—was disabled within the meaning of Title II. The next question, then, is whether he "was 'qualified' to take part in the 'services, programs, or activities' of the [LCJ].'" *Id,* at 385. In applying this step, the Sixth Circuit has held "that the phrase 'services, programs, or activities' encompasses virtually everything that a public entity does." *Johnson v. City of Saline*, 151 F.3d 564, 569 (6th Cir. 1998). Therefore, in the jailhouse setting, almost anything—including access to "medical care, bathroom facilities, or meals," for example, "could support the required prima facie showing" as government services, programs, or activities. *Keller*, 860 F. App'x at 386; *see also Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210, (1998) (observing that "[m]odern prisons provide inmates with many recreational 'activities,' medical 'services,' and

educational and vocational 'programs,' all of which at least theoretically 'benefit' the prisoners"). Accordingly, because Assi was a detainee at the LCJ, he has plausibly alleged that he was "qualified" to take part in its "services, programs, or activities"—thus, the second element is satisfied.

The more difficult question arrives at step three: whether Assi has plausibly alleged that he was "excluded from participation in" or "denied the benefits of" any of the LCJ's "services, programs, or activities." 42 U.S.C. § 12132. Importantly, the Sixth Circuit has interpreted this portion of Title II only "to require that covered entities provide '*meaningful access*' to their services, programs, and activities." *Keller*, 860 F. App'x at 386 (emphasis added) (quoting *Ability Ctr. of Greater Toledo v. City of Sandusky*, 385 F.3d 901, 909 (6th Cir. 2004)). The Sixth Circuit has emphasized, however, that "meaningful access" does not mean that an accommodation must "be perfect or the one most strongly preferred by the plaintiff." *Id.* at 387 (internal quotation marks and modifications omitted). For example, in *Keller,* the plaintiff brought a Title II claim after officials confiscated his inhaler and only allowed him to use it once a day, rather than twice, as his personal physician had originally prescribed. *Id.* at 382–83. The Sixth Circuit rejected the plaintiff's argument, noting that the plaintiff's personal physician testified that he "had no issue" with the decision to give the plaintiff only one dose a day, and that this dosage was—in fact—"standard." *Id.* at 386. Moreover, the Sixth Circuit also noted that the jail's officers consistently monitored the plaintiff and reported his condition to the jail's doctor. *Id.* In short, even though the plaintiff "may not have received the precise type of medical

11

treatment that he would have preferred, [the] undisputed facts show[ed] that he received 'meaningful access' to medical treatment." *Id.*

Thus, the question is whether Assi had "meaningful access" to the LCJ's services while he was detained. Applying that inquiry first to Assi's contention that jail officials should have provided him with a TTY phone, the Court finds Assi's argument unpersuasive. Indeed, the Sixth Circuit addressed this question previously in *Tucker v. Tennessee*, 539 F.3d 526 (6th Cir. 2008). In that case, the plaintiffs—who were also hearing-impaired—brought a Title II claim against the defendant county based on its failure to provide a TTY phone in its jail for the plaintiffs to use after their arrest. The Sixth Circuit rejected the plaintiffs' claim, explaining that "[a]lthough the jail did not have TTY telephones as standard equipment, [the plaintiffs] were provided an effective means of communication with relay operators, and permitted to make a phone call. In fact, the phone call last nearly forty-five minutes." *Id.* at 537. "In essence," the plaintiffs were "ask[ing] [the] Court to find strict liability simply because the jail failed to provide exactly the auxiliary device they request—a TTY phone." *Id.* The Sixth Circuit, though, declined to adopt such a demanding regime. *Id.*

Applying *Tucker* here, the Court concludes that Assi has failed to state a viable claim. To be sure, Assi's Complaint is clear that he never had access to a TTY phone while in the LCJ. But *Tucker* demonstrates that the lack of a TTY phone alone is insufficient to state a viable Title II claim. Instead, to survive a motion to dismiss, a plaintiff must allege that he or she was denied "effective means of communication"

while in jail. Because Assi's Complaint contains no such allegations, the Court rejects his failure-to-accommodate claim based on the ADA Defendants' failure to provide a TTY phone.

Separately, Assi alleges that the ADA Defendants are liable under a failure-to-accommodate theory based on their failure to transfer him to a different facility better equipped to address his needs. In evaluating this claim, the Court must determine which—if any—needs Assi has identified that the LCJ was unable to adequately address. The Court has already disposed of Assi's claim that the LCJ is liable based on its failure to provide a TTY phone. Thus, as best as the Court can discern, the only other accommodation that Assi needed was related to his inability to hear the jail's "chow calls" from his original cell. (Compl., Doc. 1, #8–9).

As the Complaint explains, on the morning of August 5, Williams "gave [Assi] a partial tray of food and [Assi] subsequently filed a grievance." (*Id.* at #8). In that grievance, Assi "requested to be woken up for breakfast because he could not hear the 'chow call' and was denied." (*Id.* at #9). "Two days later, [Assi] requested to be moved to a different area or entirely separate facility so that he would not miss any further 'chow calls.'" (*Id.*). That same day, jail officials moved Assi to the LCJ's "drunk tank." (*Id.*). The Complaint is not clear whether Assi continued to miss the "chow calls" after the move. Instead, Assi states only that during this period in the "drunk tank," "he was not given a morning food tray or … he was only given a partial food tray." (*Id.*). This is because, Assi alleges, "Williams was often the one who oversaw that inmates

were properly fed, and … [he] would not communicate with [Assi] to allow him to receive his food." (*Id.*).

These allegations leave the Court somewhat at a loss. Assi's allegations suggest that, unlike in his original cell, where it appears he needed to respond to the chow call, presumably by reporting somewhere to receive a meal, in the "drunk tank" the guards brought the meals to the detainees. If that is the case, moving Assi from his previous cell to the "drunk tank" sounds like it may indeed have been an attempt to accommodate his inability to hear chow call. Based on the allegations in the Complaint, then, the Court cannot conclude that Assi has plausibly stated a failure-to accommodate claim based on an alleged failure to move Assi to some other area or to another facility entirely.

Of course, if Williams was withholding food from Assi while Assi was in the "drunk tank," as Assi alleges, and was doing do based on Assi's disability, Assi might—at least in theory—have a separate claim for intentional discrimination based on Williams' conduct. But Assi's Complaint does not assert such a claim, and the Court declines to fashion such a claim on Assi's behalf.

Assi might counter, though, that even if the transfer to the "drunk tank" was designed to address his inability to hear the morning chow calls, it was not an appropriate accommodation because confinement in the "drunk tank" deprived Assi of meaningful access to other services, programs, or activities at the jail. While that argument might have some merit, it fails because Assi's Complaint does not identify

how—if at all—the conditions he faced in the "drunk tank" were meaningfully different from those faced by the jail's other detainees.

Indeed, in *Meeks v. Schofield,* 10 F. Supp. 3d 774, 795 (M.D. Tenn. 2014), the plaintiff—a detainee suffering from paruresis (a condition that makes it difficult or impossible to urinate without complete privacy)—brought a similar Title II claim after he was transferred to a new cell with a private toilet. Although prison officials claimed the transfer was intended to accommodate the plaintiff's paruresis, the plaintiff maintained that transfer was nonetheless discriminatory because he "and other inmates in [his new cell unit] were excluded from participation in prison programs and services." *Id.* The Court rejected the claim, finding that the plaintiff failed to establish that he was excluded from any meaningful "prison programs and services that were available to the general population of prisoners either by reason of his perceived disability or as a result of being held [in his new housing unit]." *Id.* Indeed, as the Court explained, even after the plaintiff's relocation, he "was allowed to continue his prison job, have access to the law library, and participate in the same activities he was allowed to participate in while he was housed with the general population." *Id.*

Much like in *Meeks*, Assi has not alleged that the move to the "drunk tank" subjected him to meaningfully worse conditions than he would have otherwise faced. At most, Assi's Complaint states that, during the nine-day period when he was held in the "drunk tank," he "was denied recreation and was only permitted two showers." (Doc. 1, #9). The problem, though, is that it is not clear from the Complaint how much

15

recreation or how many showers an LCJ detainee not being held in the "drunk tank" would have expected during the same time frame. Accordingly, absent some allegations that Assi's detention in the "drunk tank" denied Assi access to services or programs that would have otherwise been available, he has failed to plausibly allege a viable failure-to-accommodate claim.

## 2. Intentional Discrimination Claims

That still leaves, though, Assi's claims against the ADA Defendants for intentional discrimination. Specifically, Assi alleges that the Defendants intentionally discriminated against him when they placed him in the "drunk tank," which separated him from his fellow detainees. (Compl., Doc. 1, #12).

Courts "analyze claims of intentional discrimination brought pursuant to the ADA under the familiar burden-shifting analysis established by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)." *Anderson v. City of Blue Ash*, 798 F.3d 338, 356 (6th Cir. 2015) (quoting *Turner v. City of Englewood*, 195 F. App'x 346, 353 (6th Cir. 2015)) (cleaned up). Under this framework, the plaintiff alleging intentional discrimination must first establish a prima facie case. To do so, the plaintiff "must show that: (1) [he] has a disability; (2) [he] is otherwise qualified; [and] (3) [he] was being excluded from participation in, denied the benefits of, or subjected to discrimination under the program because of [his] disability." *Id.* (citing *Tucker*, 539 F.3d at 532). Stated differently, "the plaintiff must show that the defendant took action because of the plaintiff's disability, i.e., the '[p]laintiff must present evidence that animus against the protected group was a significant factor in the position taken

16

by the municipal decision-makers themselves or by those to whom the decision-makers were knowingly responsive.'" *Id.* (quoting *Turner*, 195 F. App'x at 353). Moreover, "the plaintiff must show that the discrimination was *intentionally* directed toward him or her in particular." *Id.* (quoting *Tucker*, 539 F.3d at 532).

After the plaintiff has established "a prima facie case of discrimination, the defendant 'must then offer a legitimate, nondiscriminatory reason for its' challenged action" *Id.* (quoting *Sjostrand v. Ohio State Univ.*, 750 F.3d 596, 599 (6th Cir. 2014)). If the defendant is able to do so, then the plaintiff must "present evidence allowing a jury to find that [the defendant's] explanation is a pretext for unlawful discrimination.'" *Id.* (quoting *Sjostrand*, 750 F.3d at 599).

In this case, the parties do not dispute that Assi satisfies the first and second elements—that is, he was disabled and otherwise qualified. Assi's case fails, however, on the third step, because he has not plausibly alleged that he was "subjected to discrimination" because of his disability. As already discussed, although Assi contends that he was moved to the "drunk tank" based on his disability, he has not alleged that the conditions of his detention there were meaningfully worse than would have been the case otherwise. Accordingly, Assi has failed plausibly allege that he was discriminated against, and thus his intentional discrimination claim falls short when measured against the *Iqbal/Twombly* standard.

For those reasons, the Court **DISMISSES** Count I as to all Defendants.

**B.    Count III: Claims Under The Ohio Constitution**

Next, the Court turns to Count III of Assi's Complaint. There, Assi asserts claims against Hanshaw, Golsby, J. Spoljaric, and Dillon under Article I, § 11 of the Ohio Constitution based on alleged violations of Assi's right to freedom of speech. These claims arise out of two separate incidents. First, Assi alleges that, on August 9, 2019, he "began to loudly read from his Bible as a form of protest for being confined to the 'drunk tank.'" (Compl., Doc. 1, #10). In retaliation, Hanshaw and Golsby removed Assi from his cell and placed him in a restraint chair. (*Id.*). Second, Assi alleges that, on August 12 or 13, 2019, he asked to speak to a shift supervisor to file grievances. (*Id.*). At that time, B. Spoljaric warned Assi that "filing grievances would make [Assi's] life worse." (*Id.*). Soon thereafter, J. Spoljaric entered the "drunk tank," took Assi's blanket and sheet, and then placed him in a restraint chair again. (*Id.*). Assi alleges that he asked Dillon for help while he was in the chair, but she refused. (*Id.* at #11).

The Court can quickly dispense with these claims. Although Assi is correct that Article I, § 11 of the Ohio Constitution enshrines the right of "[e]very citizen [to] freely speak," the Constitution does not afford citizens a private right of action for violations of this right. *Hagedorn v. Cattani*, 715 F. App'x 499, 509 (6th Cir. 2017) (collecting cases and "hold[ing] that Ohio does not recognize a private cause of action to enforce the free-speech rights enumerated in Article I, Section 11 of the Ohio Constitution").

Accordingly, the Court **DISMISSES** Count III as to all Defendants.

**C.      Counts II, IV, and V: Section 1983 Claims**

Finally, the Court addresses Counts II, IV, and V of Assi's Complaint. Each of these counts, which were brought pursuant to 18 U.S.C. § 1983, addresses violations of various rights protected under the U.S. Constitution. Specifically, Count II alleges restraint of Assi's right to freedom of speech in violation of the First Amendment; Count IV alleges excessive force in violation of due process under the Fourteenth Amendment; and Count V asserts claims for failure to train and supervise on the part of the LCJ's management that led to the other alleged constitutional violations in Counts II and IV.

A plaintiff can sue a defendant under § 1983 in that defendant's individual capacity, official capacity, or both. As the label suggests, an individual-capacity claim is directed against the person him or herself, and the liability for the conduct extends only to that person. An official-capacity claim against a public employee under § 1983, by contrast, is really a claim against the individual's employer—otherwise known as a *Monell* claim. *Curtis v. Breathitt Cnty. Fiscal Ct.*, 756 F. App'x 519, 525 (6th Cir. 2018) ("An official capacity claim filed against a public employee generally represents another way of pleading an action against the public entity that agent represents.") (citing *Kentucky v. Graham*, 473 U.S. 159, 165 (1985)). So, for example, if a plaintiff were to sue a county law-enforcement officer in the officer's official capacity, that is for all intents and purposes a *Monell* suit against the county itself. *Graham*, 473 U.S. at 166 ("[A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the entity.").

In this case, Assi's Complaint brings both kinds of § 1983 claims—that is, claims against the Defendants in their individual capacities as well as in their official capacities. Accordingly, the Court's analysis of Assi's section § 1983 claims proceeds in two parts, beginning first with Assi's individual capacity claims against the various individual Defendants, before turning to his official capacity claims.

### 1. Individual Capacity Claims

#### a. *Count II: Restraint Of Freedom Of Speech*

First, in Count II, Assi brings claims against Hanshaw, Golsby, J. Spoljaric, and Dillon for restraint of his right to freedom of speech as guaranteed by the First Amendment. (Compl., Doc. 1, #13–14). The factual allegations underlying these claims duplicate those underlying Assi's already-dismissed claims under the Ohio Constitution. Specifically, Assi alleges that these four Defendant violated his right to freedom of speech "when they first placed [Assi] in a restraint chair for reciting Bible verses and again by placing [Assi] in the restraint chair [for] filing grievances." (*Id.* at #14).

Although Defendants' Motion to Dismiss suggests that Defendants are seeking dismissal of all claims against them, they offer no arguments in favor of dismissing Count II, at least as to those claims against Hanshaw, Golsby, and J. Spoljaric in their individual capacities.

The Defendants do contend, however, that Count II should be dismissed with regard to Dillon. (Mot., Doc. 20, #112; Reply, Doc. 22, #146–47). This is because, unlike Hanshaw, Golsby, and J. Spoljaric, the Complaint does not contend that Dillon

directly played a role in *placing* Assi in the restraint chair in retaliation for exercising his right to freedom of speech. Instead, Assi simply alleges that Dillon saw him in the restraint chair after J. Spoljaric had placed him in it, and declined Assi's request for assistance. (Compl., Doc. 1, #11). Thus, Defendants contend that Dillon cannot be held liable for retaliation under the First Amendment based merely on her failure to act—accordingly, they argue, the Court should dismiss Count II as to Dillon. (Reply, Doc. 22, #146–47).

As the Sixth Circuit has observed, "[a] prisoner retains First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections systems." *Smith v. Campbell*, 250 F.3d 1032, 1036 (6th Cir. 2001) (citing *Pell v. Procunier*, 417 U.S. 817, 822 (1974)). "Retaliation based upon a prisoner's exercise of his or her constitutional rights violates the Constitution." *Id.* (citing *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999)). To assert a First Amendment retaliation claim, a plaintiff must establish three elements: "(1) [he or she] engaged in constitutionally protected speech, (2) an adverse action taken against [him or her] caused an injury that would chill a person of ordinary firmness from continuing the speech, and (3) that action was motivated at least in part by the protected speech." *Clark v. Stone*, 998 F.3d 287, 302–03 (6th Cir. 2021).

Applying that rule here, the question is whether Dillon's failure to assist Assi when he asked for help constitutes an "adverse action" for the purposes of the First Amendment retaliation inquiry. Defendants maintain that is does not. Assi, for his

part, argues that inaction *can* give rise to a viable First Amendment retaliation claim. In support, he points to the Sixth Circuit's decision in *Fazica v. Jordan*, where the Court held that "a reasonable jury could find that … [the d]efendants violated [the plaintiff's] clearly established constitutional rights either by directly using excessive force against her or by observing others doing so and *failing to act*." 926 F.3d 283, 290 (6thCir. 2019) (emphasis added). *Fazica,* though, relates to the failure to act in the excessive force context. The case does not address whether the failure to act can constitute an adverse action sufficient to give rise to a First Amendment retaliation claim. On that front, Assi provides no case law in support of his argument. Moreover, case law from outside this circuit indicates that inaction theories generally cannot sustain First Amendment retaliation claims. *See, e.g.*, *L. H. v. Pittston Area Sch. Dist.*, 666 F. App'x 213, 216 (3rd Cir. 2016) (finding that "allegations of inaction are not sufficient to establish an actionable claim for retaliation").

Accordingly, the Court **DISMISSES** Count II as to Dillon in her individual capacity.

### b. *Count IV: Excessive Force*

Next, the Court turns to Count IV in Assi's Complaint, which purports to bring claims against Hanshaw, Golsby, J. Spoljaric, B. Spoljaric, Williams, Dillon, Cochran, Bowles, Chinn, and Chapman for excessive force in violation of the Fourteenth Amendment's due process clause. The Court says that Count IV "purports" to bring excessive force claims, because although that is the title Assi uses, many of the factual allegations he offers in support of these claims are devoid of any meaningful use of

force. For example, Assi alleges that the Defendants violated his right to due process by denying him meals, taking his bed sheets, and confining him to the jail's "drunk tank." (Compl., Doc. 1, #15). Any force at issue in these incidents is—at most—de minimis, and thus would plainly fail to support an excessive force claim. That said, although these incidents could not support an excessive force claim, they could—at least in theory—amount to condition-of-confinement claims. Accordingly, the Court divides the alleged incidents in Count IV into two separate categories: (1) incidents suggesting or best interpreted as condition-of-confinement claims, and (2) incidents suggesting or best interpreted as excessive force claims. The Court begins its analysis with the latter category, before turning to the former.

### i. Claims Potentially Sounding In Excessive Force

First, the Court turns to those incidents in Count IV more closely resembling excessive force claims. Specifically, Assi alleges that he was subjected to excessive force when he was (1) "placed into a restraint chair on three separate occasions without proper reason or authority;" (2) "taken to a shower while fully clothed and handcuffed;" and (3) "attacked in the 'drunk tank' by Defendant Hanshaw when Defendant Hanshaw had his taser drawn and used a strobe light to purposely disorient [Assi, as] a hearing-impaired individual." (*Id.*).

As the Sixth Circuit recently observed, "[p]ersons in the criminal justice system invoke different constitutional amendments in their 42 U.S.C. § 1983 suits depending on their status." *Hale v. Boyle Cnty.,* 18 F.4th 845, 852 (6th Cir. 2021). For example, "[a]rrested persons bring § 1983 claims under the Fourth Amendment's protection

from unreasonable search and seizure." *Id.* On the other hand, "[d]etained persons …
do so under the Fourteenth Amendment's Due Process Clause." *Id.* Finally, "convicted
persons [bring claims] under the Eighth Amendment's protection from cruel and
unusual punishment." *Id.*[5]

Depending on which Amendment applies, courts apply different analytical
frameworks to evaluate the plaintiff's excessive force claims. When courts examine
an arrested person's claims under the Fourth Amendment, or a pretrial detainee's
claims under the Fourteenth Amendment, they apply a "wholly objective standard"—
that is, they ask whether the use of force was objectively unreasonable. *Id.* On the
other hand, when courts examine a post-conviction offender's claim under the Eighth
Amendment, they invoke a test with both objective and subjective components, the
latter of which asks whether force was applied maliciously and sadistically to cause
harm. *Id.*

In this case, Assi was not a post-conviction offender—thus, the Eighth
Amendment's objective/subjective test is clearly inapplicable. Whether Assi was an
arrested person (and thus protected under the Fourth Amendment), or instead a
detained person (and thus protected by the Fourteenth Amendment's Due Process
Clause) is a trickier call. The Sixth Circuit has observed that, for persons arrested

---

[5] To be clear, when the Court refers to the Fourth Amendment, or the Eighth Amendment,
the Court is referring to the source of the underlying analytical framework. Those
Amendments apply to state actors only through incorporation under the Fourteenth
Amendment. Thus, the ultimate source of the constitutional right that the state actors here
are allegedly violating, thereby giving rise to a § 1983 claim, is the Fourteenth Amendment.
That said, the Court will refer to the analytical frameworks by reference to the underlying
Amendments.

without a warrant, the "dividing line between the Fourth and Fourteenth Amendment zones of protection [is] the probable-cause hearing." *Guy v. Metro. Gov't of Nashville*, 687 F. App'x 471, 474 n.3 (6th Cir. 2017) (quoting *Aldini v. Johnson*, 609 F.3d 858, 867 (6th Cir. 2010)). Here, though, it is unclear when Assi had his probable cause hearing, or whether he was arrested with a warrant. The distinction, though, ends up making no practical difference, as whether the Fourth or the Fourteenth Amendment applies, the Court employs the same wholly objective standard in evaluating Assi's claims.

In determining whether the use of force was objectively reasonable, factors a court may consider include, but are not limited to, "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015). Importantly, however, courts must tailor their analysis to "the facts and circumstances of each particular case as viewed from the perspective of a reasonable officer on the scene, including what the officer knew at the time." *Moderwell v. Cuyahoga Cnty.*, 997 F.3d 653, 662 (6th Cir. 2021) (citation and internal quotation marks omitted).

The Court addresses each of the alleged incidents of excessive force in Assi's Complaint in succession.

First, Assi alleges that Defendants Bowles and Chinn employed excessive force when they attempted to throw or coerce him into the jail's shower. The Court describes Bowles and Chinn as attempting to "throw *or* coerce" Assi because the exact nature of the force used in this incident—or indeed, whether force was used at all— is not entirely clear from the Complaint. Assi's Complaint states that on "August 13, 2019, Defendant Bowles and Defendant Chinn removed [Assi] from the 'drunk tank' and attempted to throw him into a shower while he was fully clothed and restrained with handcuffs behind his back." (Compl., Doc. 1, #11). On the next line, though, Assi states that he "feared for his safety and declined to go into the shower fully clothed." (*Id.*). These allegations are confusing. On the one hand, Assi suggests that Bowles and Chinn assaulted him by attempting to "throw" him into the shower—allegations that, if true, could potentially support an excessive force claim. On the other hand, Assi suggests that he never actually went *into* the shower, not because he physically resisted Bowles and Chinn, but simply because he declined to do so. By that language, then, it sounds like Bowles and Chinn merely attempted to coerce Assi into the shower, without ever applying any physical force to achieve that end. If so, it is unclear to the Court how this incident could support an excessive force claim.

The apparent inconsistencies in Assi's Complaint pose a problem. As the Eastern District of Michigan has observed, "[w]hen inconsistent factual allegations are made for reasons other than the pleader's uncertainty as to which allegation [is] true, dismissal is appropriate." *Mrla v. Fannie Mae*, No. 15-cv-13370, 2016 WL 3924112, at *5 (E.D. Mich. July 21, 2016) (collecting cases). Moreover, the Sixth

Circuit has also observed that "[w]hen claiming damages for violations of constitutional rights, [p]laintiffs must allege, with particularity, facts that demonstrate what each defendant did to violate the asserted constitutional right." *Ondo v. City of Cleveland*, 795 F.3d 597, 610–11 (6th Cir. 2015) (citation and internal quotation marks omitted). In this instance, Assi's allegations against Bowles and Chinn related to the shower incident are simply too vague and inconsistent to survive Defendants' Motion to Dismiss.

Next, Assi alleges that Defendant Hanshaw is liable for excessive forced based on the August 14, 2019, incident when Hanshaw "entered the 'drunk tank' with his Taser drawn and strobe light flashing." (Compl., Doc. 1, #11). According to Assi, "due to his disability, [he] could not understand any commands being given by Deputy Hanshaw," and thus he "feared for his safety." (*Id.*). Defendants argue that the Court should dismiss this claim because Assi's Complaint "never alleges that any physical force was used by Defendant Hanshaw during this incident or that [Assi] was physically harmed." (Mot., Doc. 20, #125).

To state a cognizable excessive force claim, a plaintiff must allege—as a threshold matter—that a state actor's conduct constituted the use of force. The question, then, is whether drawing a taser and flashing a strobe light are a type of force for the purposes evaluating an excessive force claim.

With regard to the use of the strobe light, the Western District of Tennessee recently suggested in *Anderson v. Bonner* that using a strobe light could constitute a type of force necessary to support an excessive force claim in the separate—but closely

related—Eighth Amendment context. *Anderson v. Bonner,* No. 2:20-cv-2437, 2022 WL 1607842, at *3 (W.D. Tenn. May 20, 2022). In *Anderson,* though, the plaintiff alleged that the defendant had "plac[ed] [the] strobe light in [the plaintiff's] eyes" for such a duration as to cause lasting eye irritation. *Id.* Directly placing a strobe light in front of an individual's eyes strikes the Court as readily distinguishable from the instant case, where Assi merely alleges that the strobe light was used in his cell in such a manner as to temporarily "disorient" him. (Compl., Doc. 1, #15). Because Assi has identified no precedent suggesting that the use of a strobe light generally constitutes a type of force necessary to sustain an excessive force claim, the Court rejects Assi's efforts to rely on Hanshaw's use of the strobe light to support his claim in this case.

Assi's argument is slightly—but only slightly—stronger with regard to his allegation that Hanshaw "drew" a taser. To be sure, the Sixth Circuit has suggested that *pointing* a taser at a person could, at least in theory, constitute force for the purposes of supporting an excessive force claim. *Stricker v. Twp. of Cambridge*, 710 F.3d 350, 364 (6th Cir. 2013) (holding that the use of force, including "pointing a taser gun," was not excessive under the circumstances). That said, the Sixth Circuit has never actually found that merely pointing a taser constituted *excessive* force. *Evans v. Plummer*, 687 F. App'x 434, 442 (6th Cir. 2017) (observing that the Sixth Circuit "has never found that pointing a taser, as opposed to actually discharging one, constitutes the use of excessive force"). It appears, then, that the act of pointing a taser approaches the outer reaches of the type of activity that can constitute excessive

28

force. Here, though, Assi asks the Court to stretch the concept of "excessive force" even further—to encompass *drawing* a taser, rather than actually pointing it. But Assi provides the Court with no precedent—binding or otherwise—that would support making this conceptual leap. Accordingly, the Court concludes that merely drawing a taser—even in combination with using a strobe light in a disorienting manner—does not constitute the prerequisite force necessary to plausibly allege an excessive force claim.

Finally, Assi alleges that multiple of the Defendants used excessive force when they confined him in a restraint chair on three separate occasions. According to the Complaint, Assi was first placed in a restraint chair on August 9. (Compl., Doc. 1, #10). That day "he began to read loudly from his Bible as a form of protest for being confined to the 'drunk tank.'" (*Id.*). In retaliation, Defendants Hanshaw and Golsby "removed [Assi] from the 'drunk tank' … and placed [him] in a restraint chair as punishment." (*Id.*). Next, on August 12, Assi alleges that he "asked to speak with a shift supervisor to file grievances." (*Id.*). In response, Defendant B. Spoljaric "told [Assi] that 'filing grievances would make his life worse.'" (*Id.*). Soon thereafter, Assi states that "Jonathon Spoljaric entered the 'drunk tank' in the middle of the night while [Assi] was sleeping" and "demanded [Assi's] blanket and sheet." (*Id.*). "When [Assi] asked why … Spoljaric was taking his blanket and sheet, [Spoljaric] removed [Assi] from the 'drunk tank' and confined him to a restraint chair for several hours." (*Id.*). During this time, Assi alleges that he also "requested help from Defendant Dillon," who "told him to not 'talk back' and … laughed at [Assi] while doing so." (*Id.*

at #11). Third, Assi alleges that on August 14, after Hanshaw "entered the 'drunk tank' with his Taser drawn and strobe light flashing," Hanshaw and Cochran "placed [Assi] into the restraint chair without reason or authority to do so." (*Id.*).

When state actors use a restraint chair on a pretrial detainee, there are potentially two separate "incidents" of force that could give rise to an excessive force claim. First, of course, the plaintiff might allege that the actors used excessive force in the course of *placing* the individual in the restraint chair. For example, a plaintiff might allege that a prison guard violently picked him or her up and threw him or her in the chair. Second, independently, the plaintiff could allege that his or her *confinement* in the restraint chair itself constituted excessive force.

In this case, Assi's claims related to the restraint chair appear to be based solely on the second type of force. That is, Assi does not allege that any of the Defendants used excessive force in the course of placing him in the restraint chair in the first instance—only that his confinement in the restraint chair itself constituted excessive force.

On that front, the Court agrees with Assi that confinement in a restraint chair can supply the force necessary to support an excessive force claim. But while it *can* support such a claim, that does not mean that in a given case it *will* support such a claim—the question then is whether a plaintiff has plausibly alleged that the amount of force used was objectively unreasonable under the circumstances.

In evaluating excessive force claims based on confinement in a restraint chair, a key element courts generally focus on is the duration of a plaintiff's confinement.

For example, in *Howell v. NaphCare, Inc.*, this Court found that officials acted reasonably when they held a detainee in a restraint chair for four hours, because they believed the detainee was having a violent psychiatric episode. No. 1:19-cv-373, 2021 WL 5083726, at *12 (S.D. Ohio Nov. 2, 2021) (finding that placing a detainee in a restraint chair for four hours "was an appropriate reaction to the [officials'] perception that [the inmate] was at risk of harming himself or others"). Similarly, in *Rodriguez Ortiz v. Jefferson County,* the Eastern District of Tennessee found that a pretrial detainee was not subjected to excessive force when he was placed in a restraint chair for three hours after the pretrial detainee engaged in an altercation during booking. No. 3:17-cv-00401, 2019 WL 5932757, at *8 (E.D. Tenn. Nov. 12, 2019).

The focus on the duration of confinement makes some intuitive sense. With most other excessive force claims, the injury courts evaluate is often based on immediate and instantaneous harm (e.g., being tased, kicked, etc.). Confinement in a restraint chair, however, does not harm a plaintiff in the same way. Rather, the injury caused by confinement in a restraint chair generally accumulates over time, based on the progressive discomfort and irritation of being unable to move one's limbs.

That presents a problem for Assi, at least with regard to the August 9 and August 14 restraint chair incidents. In those instances he fails to allege how long he was actually confined. For example, in describing the August 9 incident, Assi's Complaint states only that Defendants Hanshaw and Golsby "removed [Assi] from the 'drunk tank' … and placed in a restraint chair as punishment." (Doc. 1, #10). The Complaint, though, does not explain how and when Assi was eventually released.

Similarly, with regard to the August 14 incident, the Complaint states only that Hanshaw and Cochran "placed [Assi] into the restraint chair without reason or authority to do so." (*Id.* at #11). Again, though, the Complaint offers no sense of how long Assi was actually confined. Of course, while it is possible Assi was confined for a substantial period of time in a manner that could—at least in theory—support a viable excessive force claim, it is also possible that he was confined only momentarily, in which case the use of force was effectively de minimis. At the pleadings stage, however, it is Assi's burden to "make sufficient factual allegations that, taken as true, raise the likelihood of a legal claim that is more than possible, but indeed plausible." *Darby*, 964 F.3d at 444. Assi fails to make sufficient factual allegations here to cross that line, and thus his excessive force claims based on the August 9 and August 14 restraint chair incidents must be dismissed.

Assi fares better, though, with regard to the August 12 incident, where his Complaint states that J. Spoljaric "removed [him] from the 'drunk tank' and confined him to a restraint chair *for several hours*." (Doc. 1, #10 (emphasis added)). "Several hours," while admittedly somewhat vague, makes clear that Assi was confined in the restraint chair on August 12 for a relatively significant period of time. Moreover, Assi also alleges that the use of force here was entirely unprovoked, as Assi was asleep at the time J. Spolaric entered his cell and was only placed in the restraint chair after Assi asked why J. Spoljaric was taking his bedding. These allegations, if true, could indicate that J. Spoljaric's use of force was objectively unreasonable under the

circumstances. Accordingly, the Court declines to dismiss Assi's excessive force claim against J. Spoljaric related to his August 12 confinement in the restraint chair.

According to Assi's Complaint, though, J. Spoljaric was not the only officer present that night. Rather, Assi alleges that, sometime after he was placed in the restraint chair, he asked Dillon for help. Dillon responded, however, by telling Assi "to not 'talk back' and … laughed at [Assi] while doing so." (*Id.* at #11).

According to the Sixth Circuit, an officer who fails to act to prevent the use of excessive force may still be held liable for that "fail[ure] to intervene when '(1) the officer observed or had reason to know that excessive force would be or was being used, and (2) the officer had both the opportunity and the means to prevent the harm from occurring.'" *Grinnell v. City of Taylor*, No. 21-2748, 2022 WL 1562291, at *6 (6th Cir. May 18, 2022) (quoting *Floyd v. City of Detroit*, 518 F.3d 398, 406 (6th Cir. 2008)).

Applying that rule here, the Court concludes that Assi has failed to state a cognizable failure-to-intervene claim against Dillon. For this claim to survive, Assi would have to allege that Dillon "observed or had reason to know that excessive force would be or was being used." Here, although it is clear that Dillon saw Assi in the chair, it is not clear that Dillon knew or would have had reason to know that Assi's confinement in the restraint chair constituted *excessive* force. Assi does not allege, for example, that Dillon knew J. Spoljaric had taken him from his bed and placed him in the chair without any valid reason for doing so. Moreover, as already discussed, to establish an excessive force claim arising out of confinement in a restraint chair, a key factor at issue is the duration of time for which a plaintiff is allegedly restrained.

Here, though, it is unclear when Assi asked Dillon for help or whether she knew how long he had been restrained. Absent such allegations, Assi has failed to plausibly allege that Dillon knew or had reason to know excessive force would be or was being used. Accordingly, the Court **DISMISSES** Assi's excessive force claim against Dillon.

### ii. Claims Sounding More In Conditions of Confinement

Next, the Court addresses those incidents in Count IV more closely resembling condition-of-confinement claims. Specifically, Assi alleges that he was subjected to unconstitutional conditions of confinement when (1) "he was denied meals;" (2) "his blanket and sheet were removed from him while he slept without reason;" and (3) "[h]e was placed in the 'drunk tank' for two weeks." (Compl., Doc. 1, #15).

"The Fourteenth Amendment applies to conditions-of-confinement claims brought by pretrial detainees." *Bensfield v. Murray*, No. 4:21-cv-P104, 2022 WL 508902, at *2 (W.D. Ky. Feb. 18, 2022) (citing *Brawner v. Scott Cnty.*, 14 F.4th 585, 591 (6th Cir. 2021)). Under this standard, the plaintiff must satisfy two requirements. First, the plaintiff "must show 'that [he or she] is incarcerated under conditions posing a substantial risk of serious harm.'" *Id.* (citing *Farmer v. Brennan,* 511 U.S. 825, 834 (1994)); *see also Westmoreland v. Butler Cnty.*, 29 F.4th 721, 728 (6th Cir. 2022). Second, the "plaintiff must show that [the Defendant] acted 'deliberately' and 'recklessly in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known.'" *Id.* (quoting *Brawner*, 14 F.4th at 596).

Assi first argues that he was subjected to unconstitutional conditions of confinement "[w]hen he was denied meals." (Compl., Doc. 1, #15). Specifically, Assi

asserts that on August 5 and between August 7 and August 16, he "was not given a morning food tray or … was only given a partial food tray." (*Id.* at #8–9). He attributes this treatment to Defendant Williams, who "was often the one who oversaw that inmates were properly fed." (*Id.*). Because Williams denied him certain meals or portions of meals over this multi-week period, Assi argues, Williams is liable under the Fourteenth Amendment's due process clause.

The Court is not persuaded. As already discussed, the first element of a condition-of-confinement claim requires that the plaintiff show that he or she was subjected to a *substantial* risk of *serious* harm. Denying a few meals over an extended period will generally not suffice to state a viable claim. Indeed, as the Sixth Circuit has previously observed in the related Eighth Amendment context, "the withholding of meals, while it may result in some discomfort to the prisoner," does not amount to a constitutional violation when "the prisoner continues to receive adequate nutrition." *Richmond v. Settles*, 450 F. App'x 448, 456 (6th Cir. 2011) (citing *Cunningham v. Jones*, 667 F.2d 565, 566 (6th Cir. 1982)). For example, in *Cunningham*, the Sixth Circuit affirmed the dismissal of a prisoner's § 1983 claim where the defendant only served the prisoner one meal a day for fifteen days and the defendant showed that these meals met the prisoner's nutritional needs. 667 F.2d at 566.

Here, Assi alleges that Williams denied him—at most—one meal a day over a roughly week and a half long period. (Compl., Doc. 1, #8–9). That still indicates, though, that he was receiving two meals a day—lunch and dinner—during that time, which is likely significantly more food than the plaintiff received in *Cunningham*.

More importantly, Assi has not alleged that his health suffered, or was at risk of suffering, by virtue of missing these meals. Absent such allegations, Assi cannot show that he was "incarcerated under conditions posing a substantial risk of serious harm." Accordingly, the Court rejects Assi's condition-of-confinement claim against Defendant Williams related to the deprivation of his morning meals.

Assi also brings a condition-of-confinement claim related to the removal of his blanket and sheets. As his Complaint alleges, on "August 12, 2019 and while [Assi] was confined to the 'drunk tank,' Defendant [J.] Spoljaric entered the 'drunk tank' in the middle of the night while [Assi] was sleeping. [J. Spoljaric] then demanded [Assi's] blanket and sheet." (Compl., Doc. 1, #10).

For the same reason Assi's claim related to the deprivation of meals fails, the claim related to his bedding fails as well. Although Assi's allegations suggest that J. Spoljaric subjected him to *discomfort* by virtue of taking his sheets and blanket, he does not allege that J. Spoljaric left him at a substantial risk of serious harm. For that reason, Assi's condition-of-confinement claim related to the confiscation of his bedding must fail. *See Thompson v. Skaggs,* No. 2:22-cv-682, 2022 WL 1485281, at *5 (S.D. Ohio May 11, 2022), *report and recommendation adopted*, 2022 WL 1811080 (S.D. Ohio June 2, 2022) (observing that "[s]hort term deprivations of toilet paper, towels, sheets, blankets, mattresses, toothpaste, toothbrushes, and the like do not rise to the level of a constitutional violation") (quoting *Gilland v. Owens,* 718 F. Supp 665, 685 (W.D. Tenn. 1989); *Unthank v. Beavers,* No. 5:19CV-P28-TBR, 2019 WL 3281191, at *5 (W.D. Ky. July 19, 2019) (same); *Semelbauer v. Muskegon Cnty.,* No.

1:14-cv-1245, 2015 U.S. Dist. LEXIS 189417, at *30 (W.D. Mich. Sept. 11, 2015) (same).

Finally, Assi brings a condition-of-confinement claim related to his confinement in the "drunk tank" for two weeks. As previously discussed, however, Assi fails to clearly explain how his detention in the "drunk tank"—in itself—imposed any special hardship that he would not have experienced in any other part of the jail. At most, his Complaint vaguely suggests that he may have been deprived of showers and recreation opportunities related to or as a result of being detained in the "drunk tank." But again, to state a cognizable condition-of-confinement claim, Assi must plausibly allege that he was subjected to a substantial risk of serious harm. With regard to the denial of showers, Assi states that he "was only permitted two showers" between August 7 and August 16, 2019. (Compl., Doc. 1, #9). The Court cannot plausibly infer that being allowed only two showers over the course of a week and a half long period would have posed a substantial risk of serious harm to Assi. *See Mihalic v. Mcdowell,* No. 3:22-cv-P101-DJH, 2022 WL 989176, at *1 (W.D. Ky. Mar. 31, 2022) (dismissing a pretrial detainee's condition-of-confinement claim where the plaintiff alleged "that he was housed 'for over 2 weeks with 45 other inmates with 1 toilet and no shower'"). Similarly, the Court cannot infer that being deprived recreational opportunities during a week and a half long period would have posed a substantial risk of any harm—let alone a serious one.

Accordingly, the Court **DISMISSES** Assi's condition-of-confinement claims against all Defendants in their individual capacities.

c.    *Count V: Supervisory Liability*

Finally, the Court turns to Count V. There, Assi asserts claims against Chapman, Hitchcock, and Lawless (collectively the "Supervisory Defendants") for "failure to hire, train, and supervise, and for customs, policies, and practices causing violations of the Fourteenth Amendment." (Compl., Doc. 1, #16).

The scope of supervisory liability in § 1983 cases is limited. As the Sixth Circuit recently explained, "[g]enerally, the doctrine of respondeat superior does not apply in § 1983 lawsuits to impute liability onto supervisory personnel." *Farmer v. Phillips*, No. 20-5730, 2021 WL 6210609, at *2 (6th Cir. Oct. 19, 2021) (citing *Polk Cnty. v. Dodson*, 454 U.S. 312, 325 (1981)); *see also Winkler v. Madison Cnty.*, 893 F.3d 877, 898 (6th Cir. 2018) (citing *Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir. 1984)). Rather, individuals sued in their personal capacity under § 1983 are liable only for their own unconstitutional behavior. *See Murphy v. Grenier*, 406 F. App'x 972, 974 (6th Cir. 2011). That is not to say that a supervisor is only liable if he or she laid hands on the plaintiff. But to establish a supervisor's liability, the Sixth Circuit has held that the plaintiff must show, at the very least, "that the supervisor encouraged the specific incident of misconduct or in some other way directly participated in it." *Sexton v. Cernuto*, 18 F.4th 177, 185 (6th Cir. 2021) (quoting *Doe v. Claiborne Cnty.*, 103 F.3d 495, 511 (6th Cir. 1996)). Moreover, supervisory liability will not attach based on a "a mere failure to act." *Crawford v. Tilley*, 15 F.4th 752, 762 (6th Cir. 2021).

Here, the Court struggles to discern the exact basis of Assi's individual-capacity claims against the Supervisory Defendants. Take Lawless as an example.

Initially, in Count V, Assi's Complaint states that Lawless "failed to properly screen potential deputy/corrections officer candidates through a background review process." (Doc. 1, #16). Without explaining *how* Lawless failed to screen, however, Assi then pivots and instead contends that Lawless is liable because he "continually and consistently ratified the conduct of deputies/corrections officers who violate constitutional rights by failing to take appropriate action." (*Id.* at #17). While Assi admittedly provides slightly more detail in explaining this ratification theory, he quickly moves on from that, as well, and instead proceeds to allege that Lawless "implemented customs and policies for training and supervision of Lawrence County Sheriff's Office deputies/corrections officers on jail operations that, on their face, violate the Fourteenth Amendment." (*Id.*). Alternatively, Assi alleges that "upon information and belief, Defendant Lawless implemented otherwise facially valid customs and policies in a manner such that constitutional viola[t]ions were likely to be and were visited upon those incarcerated in the Lawrence County Jail." (*Id.*). Again, Assi's Complaint never explains what these policies or customs may have been.

Of course, it is not necessarily problematic for plaintiffs to assert alternative bases for liability in their complaints. *Mrla*, 2016 WL 3924112, at *5. Assi's problem, though, is that, in pursuing this "kitchen sink" approach to pleading, he leaves the Court with little more than bare and conclusory allegations that Lawless adopted some policy, ratified some decision, or somehow failed to screen some individual—and that action (or inaction) ultimately led to Assi's injury. Those conclusory

allegations against Lawless are inadequate. Assi's claims against Chapman and Hitchcock suffer from the same fundamental defect.

The only concrete factual allegations Assi offers in support of his supervisory liability claims are his contentions that the Supervisory Defendants were on notice of prior unconstitutional conduct at the LCJ. For example, Assi alleges that "[d]uring Defendant Lawless's tenure as sheriff, the [LCJ] has been the subject of previous civil suits alleging constitutional violations." (Compl., Doc. 1, #17). Similarly, Assi alleges that, while detained at the LCJ, he "file[d] several grievances about his treatment with Defendant Chapman." (*Id.* at #112). Assi's logic here would appear to be that, because the Supervisory Defendants were thus aware that prior unconstitutional conduct may have occurred at the Jail, they implicitly encouraged such conduct by failing to take ameliorative steps.

In fairness to Assi, the Sixth Circuit has previously found that a supervisor may "approve[] or acquiesce[]" in a subordinate's unconstitutional conduct, and thereby become liable him or herself, where the supervisor is aware that the subordinate has a history of such conduct and "fail[s] to take adequate precautions to address the possibility of future [misconduct]." *Garza v. Lansing Sch. Dist.,* 972 F.3d 853, 869 (6th Cir. 2020). For example, in *Garza,* the plaintiff—a student—brought a supervisory liability claim against his school's principal after a teacher allegedly "abused [him] by throwing him into furniture and kicking him in response to minor misbehavior." *Id.* at 859. Because the plaintiff alleged that the defendant principal knew the teacher had a history of physically abusing students and had "t[aken] no

40

action to report or investigate [these] allegations of abuse," the Sixth Circuit found that the Plaintiff had stated a cognizable claim. *Id.* at 868–69.

In applying this deliberate indifference standard of supervisory liability, however, the Sixth Circuit has emphasized that "[s]upervisory liability is generally limited to times when the supervisor had existing knowledge of the *specific type of conduct* that led to a plaintiff's injuries." *Crawford*, 15 F.4th at 767 (emphasis added). For example, the *Crawford* Court noted that in *Garza,* the defendant was specifically aware of the "teacher's [history of] physical abuse." *Id.* (citing *Garza,* 972 F.3d at 859–65).

In this case, the only claims of subordinate misconduct that survive Defendants' Motion to Dismiss are (1) Assi's First Amendment claims against Hanshaw, Golsby, and J. Spoljaric based on confining Assi in the restraint chair in retaliation for reading his Bible aloud and filing grievances, and (2) Assi's excessive force claim against J. Spoljaric, also based on Assi's confinement in the restraint chair. The question, then, is whether Assi has plausibly alleged that the Supervisory Defendants were sufficiently aware of prior incidents of this specific type of misconduct such that they were on notice of the need to take ameliorative action. The Court concludes that Assi has not done so.

As for Assi's contention that the Supervisory Defendants were on notice based on prior lawsuits surrounding the LCJ, his Complaint states only that these lawsuits "alleg[ed] constitutional violations" and included "one suit against Defendant Hanshaw for excessive force." (Compl., Doc. 1, #17). Assi's argument that there were

prior lawsuits regarding "constitutional violations" is too general to have placed the Supervisory Defendants on notice of the specific misconduct at issue here. Assi's argument that at least one of these lawsuits was against Hanshaw and involved allegations of excessive force similarly fails, because that (1) this was only one incident, and (2) Assi does not specify what type of "excessive force" Hanshaw allegedly used, to what extent those allegations were investigated, or to what extent they proved to be true. And to the extent Assi argues that he filed grievances prior to the two restraint chair incidents, the Court finds that none of these grievances would have placed the Supervisory Defendants on notice that Hanshaw, Golsby, or J. Spoljaric were using the restraint chair in an excessive or retaliatory manner. Accordingly, the Court **DISMISSES** all claims against the Supervisory Defendants in their individual capacities.

### 2. Official Capacity Claims

That still leaves Assi's official capacity claims. At the outset, the Court notes that the exact basis of Assi's official capacity claims are not entirely clear from his Complaint. Assi names all the Defendants in this matter—except the Lawrence County Board of Commissioners—in both their official and individual capacities. Because, in the § 1983 context, official capacity claims are interpreted as claims against an individual's employer, all these official capacity § 1983 claims are thus effectively duplicative claims against the Lawrence County Board of Commissioners.

That is important, because Assi cannot simply attribute the actions of the Board's employees to the Board itself to establish the Board's liability. Rather, in the

§ 1983 context, to establish a municipal government's § 1983 liability, a plaintiff must connect his or her injury to actions taken by the municipal government *itself*. The plaintiff can do this in four ways—by demonstrating: "(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision-making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations." *Gardner v. Lexington-Fayette Urb. Cnty. Gov't*, No. 21-5941, 2022 WL 1039608, at *2 (6th Cir Mar. 9, 2022). Moreover, "[i]n addition to identifying conduct properly attributable to the [government entity], a plaintiff must show that the [government entity] was a moving force behind the alleged violation." *North v. Cuyahoga Cnty.,* 754 F. App'x 380, 386 (6th Cir. 2018) (internal quotation marks and citations omitted). Stated differently: regardless of which theory of municipal liability the plaintiff pursues, he or she must demonstrate a causal connection between the governmental entity's conduct and the deprivation alleged.

Applying that rule here, the closest Assi comes to stating a viable § 1983 claim against Lawrence County is in Count V. There, as previously discussed, Assi alleges that Chapman, Hitchcock, and Lawless are liable based on their "failure to hire, train, and supervise, and for customs, policies, and practices causing violations of the Fourteenth Amendment." (Compl., Doc. 1, #16). While these allegations are more easily interpreted as claims against the Supervisory Defendants in their individual capacities (albeit unsuccessful ones), it is possible Assi also asserts them as a basis to establish the Board of Commissioners' municipal liability.

43

If that is Assi's goal, though, that effort fails for the same reason that Count V failed to state viable individual-capacity claims against the Supervisory Defendants: the claims are simply too conclusory to survive. To be sure, Assi's Complaint readily mixes and matches terminology associated with *Monell* claims— "ratif[ication];" "failure to adequately train and/or supervise;" and the implementation of "customs and policies … that, on their face, violate the Fourteenth Amendment." But fatally, he makes almost no attempt to support these claims with concrete factual allegations. (*Id.* at #16–18).

Again, Assi's Complaint comes somewhat closer to meeting the pleading standards in describing the Supervisory Defendants' awareness of prior allegations of unconstitutional conduct. For example, Assi alleges that, during Sheriff Lawless's tenure, the LCJ was the subject of previous civil suits alleging constitutional violations. (*Id.* at #17). Similarly, the Complaint states that Assi filed grievances regarding unconstitutional conduct at the Jail with Chapman. (*Id.* at #11).

These allegations are perhaps best interpreted as an attempt to assert a *Monell* claim under an "inaction theory." To bring such a claim, a plaintiff must allege:

> (1) the existence of a clear and persistent pattern of illegal activity; (2) notice or constructive notice on the part of the defendant; (3) the defendant's tacit approval of the unconstitutional conduct, such that their deliberate indifference in their failure to act can be said to amount to an official policy of inaction; and (4) that the defendant's custom was the 'moving force' or direct causal link in the constitutional deprivation.

*Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005) (quoting *Doe*, 103 F.3d at 508) (modifications omitted).

Applying that rule to this case, the Court concludes Assi's efforts to establish *Monell* liability based on an "inaction theory" fail at step two—notice or constructive notice on the part of defendant. In applying this step of the analysis, the Sixth Circuit has emphasized that there must have been a sufficient number of prior incidents of a sufficiently similar type of misconduct to demonstrate that a municipal entity was on notice or constructive notice. For example, in *D'Ambrosio v. Marino*, the Sixth Circuit granted the defendant county's motion to dismiss where a plaintiff alleged that the county had failed to respond to a pattern of *Brady* violations in its prosecutors' office. 747 F.3d 378, 388 (6th Cir. 2014). As the Court explained, the plaintiff

> claim[ed] that the county had sufficient notice of an office-wide practice of persistent unconstitutional conduct by virtue of only one other *Brady* violation and nine other non-*Brady* instances of prosecutorial misconduct—all of which were committed by [one specific prosecutor] over two decades. Of these ten cited examples of misconduct, only three had been ruled as improper by the courts prior to [the plaintiff's] conviction in 1989. All three of these cases involved [the specific prosecutor's] improper trial comments; they did not involve *Brady* violations.

*Id.* (internal citations omitted).

Here, Assi's allegations in support of his argument that the County was on notice of misconduct similar to the type he experienced at the LCJ are significantly less well developed than those the Sixth Circuit rejected as inadequate in *D'Ambrosio*. Indeed, Assi only alleges that the County was on notice as a result of (1) grievances he himself had previously filed and (2) prior lawsuits alleging "constitutional violations" at the LCJ, including one suit against Hanshaw alleging excessive force.

These allegations are insufficient. As for Assi's reliance on his own grievances, none of the grievances he filed prior to the two restraint chair incidents at issue in the surviving claims would have plausibly placed officials on notice that restraint chairs were being used in an excessive or retaliatory manner at the LCJ.[6] Similarly, Assi's allegations that there had been previous lawsuits regarding unconstitutional conduct at the LCJ are vague—failing to provide specifics as to the nature of the alleged unconstitutional conduct (aside from the fact that one suit against Hanshaw alleged excessive force) and the outcome of those lawsuits.

In sum, Assi has failed to plausibly allege that the Board of Commissioners had constructive notice of the conduct at issue in his surviving claims. For that reason, the Court **DISMISSES** all § 1983 claims against the Defendants in their official capacities.

## CONCLUSION

For the reasons stated above, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' Motion (Doc. 20) and **DISMISSES** all claims in Assi's Complaint (Doc. 1), with the exception of the following: (a) Count II's First Amendment retaliation claims against Hanshaw, Golsby, and J. Spoljaric in their individual

---

[6] Moreover, even if Assi had filed grievances that would have placed officials on notice that restraint chairs were being used in an excessive or retaliatory manner, these would still likely not be sufficient to establish *Monell* liability. This is because the Sixth Circuit has suggested that, to demonstrate the pattern of misconduct necessary to prevail on an inaction theory of *Monell* liability, the plaintiff must "reach beyond the facts of this [i.e., the instant] case." *Thomas*, 398 F.3d at 434. Accordingly, Assi's own grievances alone would likely be insufficient to establish a pattern.

capacities; and (b) Count IV's Fourteenth Amendment excessive force claims against

J. Spoljaric in his individual capacity.

**SO ORDERED.**

September 2, 2022
**DATE**

**DOUGLAS R. COLE**
**UNITED STATES DISTRICT JUDGE**